CAFFERTY & SCHEIDEGGER, S.C.
840 Lake Avenue, Suite 300
Racine, WI 53403
Phone: (262) 632-5000
Facsimile: (262) 632-5686

August 24, 2026

Hon. Brett H. Ludwig
United States District Court
Eastern District of Wisconsin
517 E. Wisconsin Avenue
Milwaukee, Wisconsin 53202

RE: *United States v. James Rukstales*
Case No. 26-CR-85

Dear Judge Ludwig:

James Rukstales is a 39-year-old man from western Kenosha County who has worked with his hands since he was a teenager: framing, roofing, and, for the last several years, moving other people's furniture. He has no children, no history of violence, and, in thirty-nine years, has never been sentenced to a term of incarceration. In January 2023, thirty homemade fireworks were sold from the yard of his house to a person working for the ATF. In March 2023, agents searched that house and found marijuana he had been selling. He has lived in the community, under supervision, for the three and a half years since. He now comes before this Court for sentencing.

The person the ATF was investigating was his half-sister, Melissa Simmons. She negotiated every controlled buy in this case, and she was the seller in each of them. She was convicted of the same offense charged in Count One and sentenced by Judge Adelman to two years' probation. Mr. Rukstales respectfully asks this Court for a comparable sentence.

**Background**

*Mr. Rukstales grew up in a small Wisconsin town, in a family where fireworks were an ordinary thing.*

James Earl Rukstales was born on December 15, 1986, in Wheatland, Wisconsin. *See* Doc. 60, Revised Presentence Report (PSR), at ¶63. His father, John Rukstales, was a carpenter. His mother, Carolynne Smith, stayed home with the children. PSR ¶66. Money was tight, but as Mr. Rukstales put it to the probation officer, the family "always had clean clothes and enough food to eat." *Id.* Social services and the police were never involved with the family. *Id.*

His parents divorced when he was nine, and he bounced between their two houses. *Id.* He stayed close to his father, who "always made a way for his children." *Id.* His mother went to work full time and raised the children; he describes her as headstrong, and says that to him "she is a saint." PSR ¶67. He grew up with four full siblings (Brianna, Everett, Eric, and Arianna), and describes himself as somewhat close to them, but "a loner growing up." PSR ¶64.

He was homeschooled by his mother until second grade. PSR ¶81. He never failed or repeated a grade, never needed an individualized education plan, and was never diagnosed with a learning disability. *Id.* He graduated from Westosha Central High School on June 4, 2006, and spent a semester at UW-Parkside in 2007 before deciding that school was not for him. PSR ¶82. He is a self-taught roofer and shingler. *Id.*

What he did instead of school, from childhood forward, was build things and shoot. He was in the Boy Scouts. He competed in Junior Sportsmanship events. He competed in firearm and shooting competitions. He played football. PSR ¶68. He has never had any gang involvement. *Id.* That context matters here, because the conduct in this case did not come out of criminal ambition. It came out of a rural upbringing in which pyrotechnics were a family pastime. That is exactly how the confidential informant described it to the ATF at the outset of this investigation: the Rukstales family manufactured and sold these devices "for recreational purposes." PSR ¶14.

*He buried his brother, and then his father, and has never had a moment of help with either.*

In 2008, Mr. Rukstales' brother Everett was killed in a car accident. He was twenty-four years old. PSR ¶64. In 2024, his father died of a heart attack. PSR ¶63.

Mr. Rukstales told the probation officer that the loss of his brother and his father were the most impactful events of his life, and then, in the next breath, that "he understands life is hard and unfair and he deals with it the best he can without allowing it to get him down." PSR ¶69. He has never received any form of grief counseling. *Id.* He has never been diagnosed with a mental or emotional health condition, and he has never been treated for one. PSR ¶75.

That stoicism has had a cost. Mr. Rukstales acknowledges that he dealt with depression in his twenties. He acknowledges that when he was indicted in this case, the depression and anxiety

came back, badly enough that he thought about taking his own life, though he never made a plan and never attempted it. *Id.* What brought him out of it was not treatment. It was his girlfriend telling him to get his things together, and his doing it. *Id.* Today he manages stress by meditating, reading, playing guitar, and taking his dogs for walks. PSR ¶¶75–76. His philosophy, he told the probation officer, is "if it's a problem up there, there's an answer up there." PSR ¶75.

A man who has buried a brother and a father, and who answered a suicidal stretch by handling it alone, could use a counselor. That is something this Court can order as a condition of supervision, and § 3553(a)(2)(D) directs the Court to ensure that any treatment he needs is provided "in the most effective manner."

*His substance use is longstanding, and it has stopped.*

Mr. Rukstales first drank alcohol at twelve and first tried marijuana at thirteen. PSR ¶¶77–78. By his twenties he was using marijuana to treat the depression he was never treated for. PSR ¶78. He tried cocaine at twenty-two, was using it daily by twenty-five, and quit cold turkey at twenty-seven, on his own, without a program. PSR ¶79. He relapsed sporadically in his mid-thirties, including a period of weekly crack cocaine use, which ended roughly two weeks before his arrest in this case. *Id.*

Since then, the line has run one direction. Over three and a half years on pretrial supervision, Mr. Rukstales tested positive five times: March 16, 2023; October 27, 2023; April 30, 2024; August 21, 2024; and March 5, 2025. PSR ¶78. The last of those was seventeen months ago. There has not been another one. He told the probation officer that his relapse prevention plan "includes working." PSR ¶80.

Counsel does not ask the Court to overlook Mr. Rukstales' statement that he is not interested in AODA treatment now or in the future. PSR ¶80. But it is worth noticing what he actually did. In September 2024 this Court ordered him to submit to urinalysis and to participate in treatment if pretrial services deemed it appropriate. PSR ¶7. He stopped using. Whatever he says about treatment in the abstract, his record shows a man who responds to conditions. A condition requiring an AODA assessment and any treatment recommended by it would address this squarely, and Mr. Rukstales will comply with it.

*He has worked continuously, in hard jobs, for money he earns himself.*

Before 2020, Mr. Rukstales worked as a laborer in construction and as a roofer and shingler, earning between $12 and $30 an hour for various companies. PSR ¶84. In the off season he found work through temporary services. When that ran out, he played his guitar on the street for tips. *Id.*

He has kept working throughout this case. Pretrial supervision records reflect employment with Otto Nelson Moving and Storage from March 2022 to July 2023; Construx from July to October 2023; Walworth County Craftsman from October to December 2023; Adecco from March to June 2025; and work as an independent moving contractor from June 2025 forward, last reported in April 2026. PSR ¶83. He nets roughly $4,000 a month against roughly $3,540 in expenses, finishing each month about $460 ahead. PSR ¶86. He has received FoodShare and state health insurance only sporadically in the past, and receives neither now. PSR ¶84.

One detail in that history deserves the Court's attention. When he was arrested in March 2023, Mr. Rukstales was one week away from starting CDL classes. He had a job lined up driving over the road, and Ms. Barnett was going to travel with him. PSR ¶70. That is a substantial part of what this case has already cost him: not a criminal enterprise, but a plan to become a truck driver.

*Sarah Barnett, and a stable home.*

Mr. Rukstales knew Sarah Barnett in high school, and then lost touch with her for two decades. In 2024 he saw her working the drive-through window at a McDonald's, reached out on Facebook, and they began a relationship. PSR ¶70. The timing was not incidental. His father died that year, and hers died a month later. *Id.* Each of them became the other's support at the moment they needed one.

Ms. Barnett has struggled with alcohol addiction. Mr. Rukstales reports that she has been clean for the most part over the last two years and is doing well. *Id.* She is also the reason he stopped using cocaine and marijuana. When he was placed on conditions, she told him he needed to stop, and he did. PSR ¶80. He identifies losing her as the single circumstance most likely to put him at risk. *Id.*

They live together in Racine, in a home owned by Mr. Rukstales' brother Erik, along with a roommate and three dogs. PSR ¶71. He has lived at that address since 2024. *Id.* It is a stable residence, already known to the probation office, which has been inside it. *Id.* It is an address at which he can be supervised, starting the day this Court orders it.

*The offense, and Mr. Rukstales' place in it.*

The investigation in this case was not about Mr. Rukstales. It was about Melissa Simmons.

In July 2022, a confidential informant told ATF case agents about Ms. Simmons: that she possessed illegal explosive devices, that the CI had watched her light one at a party at her father's property, and that she said casually that she and various members of her family manufactured and sold the devices "for recreational purposes." PSR ¶14. Separately, Kenosha County law enforcement had been receiving complaints from area residents about "unknown,

loud, booming noises." PSR ¶15. The case agents then "proceeded with an investigation targeting Ms. Simmons and her family," and that investigation "relied upon multiple controlled buys of explosive devices and drugs between the CI and Ms. Simmons." *Id.*

There were four controlled buys, and Ms. Simmons was the seller in all four. On September 30, 2022, she sold the CI ten devices and 127 grams of marijuana at the family property. PSR ¶16. On October 13, 2022, she sold ten more devices in her own bedroom, and handed over an eleventh as a "freebie." PSR ¶18. On December 13, 2022, she sold twenty devices and 125.4 grams of marijuana. PSR ¶20. Each of those deals was set up by Ms. Simmons over days, weeks, or months of text messages and phone calls with the CI. PSR ¶¶16–21.

By January 2023, Ms. Simmons was no longer living at the family property. She had fought with her father, and she was temporarily staying with her brother, Mr. Rukstales, at his home in Paddock Lake. PSR ¶21. So the fourth transaction, thirty devices for $500 and 14.4 grams of cocaine for $1,000, took place in the exterior yard of the house where she was staying. PSR ¶22. It was, again, Ms. Simmons who sold. *Id.*

That January 20, 2023 transaction is Count One of the Indictment. Mr. Rukstales does not hold a license to manufacture or distribute explosive materials, PSR ¶25, and he accepts responsibility for his role in that distribution.

On March 8, 2023, case agents executed a search warrant at his residence. They recovered approximately 200 explosive devices, 86 pounds of potassium nitrate and 30 pounds of potassium perchlorate, loose fuse and cardboard tubes, five firearms and an AR upper receiver, and roughly 17.5 pounds of marijuana in two duffel bags. PSR ¶¶23–24. The marijuana is Count Two.

Counsel does not minimize any of that. The number of finished devices was large; the chemicals were dangerous to store; and having firearms in the same house made the whole picture more hazardous than Mr. Rukstales appreciated at the time. No one was hurt. There is no allegation that any device manufactured or sold by this family was ever used to damage property or to injure a person, or that it was sold to anyone who intended to do either. The Probation Office states it plainly: "This is a Title 18 and Title 21 offense and there are no identifiable victims." PSR ¶26. The ATF laboratory identified the fill in the devices as flash powder. PSR ¶22. These were consumer-style pyrotechnics, made and sold in a rural county, and the citizen complaint that started the whole investigation was a noise complaint.

*Mr. Rukstales accepts responsibility, and the omission in the record is counsel's, not his.*

The Probation Office recommends the two-level reduction under U.S.S.G. § 3E1.1(a), and notes that the government intends to move for the additional level under U.S.S.G. § 3E1.1(b). PSR ¶¶46–47. The report also notes, correctly, that defense counsel indicated a letter accepting

responsibility would be provided on Mr. Rukstales' behalf and that, as of the date of the revised report, it had not been received. PSR ¶¶28, 46.

Counsel apologizes for not getting the statement to the PSR in a timely fashion, and counsel takes responsibility for it. It should not be read as any hesitation on Mr. Rukstales' part, because there has been none. He pled guilty on May 27, 2026. PSR ¶10. He has never disputed what he did. In counsel's conversations with him, he has been earnest and unqualified: he accepts responsibility for distributing the explosive devices and for possessing marijuana with the intent to distribute it, he understands why both are crimes, and he does not offer excuses for either. What he returns to, more than anything else, is the effect this case has had on the people around him: on Ms. Barnett, whose life was rerouted with his; on his mother; on a family that has already lost a brother and a father in the years this case has been pending. He regrets that, deeply. And he is looking forward to putting this behind him and moving his life in a positive direction.

*His conduct on release.*

Mr. Rukstales was released on a personal recognizance bond and has remained in the community ever since, more than three years now. PSR ¶2. During that period, each time pretrial services notified the Court of an issue, the Court took no action. PSR ¶¶3–5, 8.

His record on release is not spotless, and counsel will not pretend otherwise. He tested positive five times, the last in March 2025. PSR ¶78. He picked up a possession case in McHenry County, Illinois in June 2023, received two years' special probation, and was discharged from that supervision earlier this month. PSR ¶53. He picked up a first-offense OWI in Racine County in August 2024. PSR ¶54. He has two pending Racine County traffic matters involving driving without a valid license. PSR ¶¶58–59.

Those are real, and the Court should weigh them. But it should also weigh what they are: driving offenses and failed tests. In the three and a half years since agents searched his home, Mr. Rukstales has not been alleged to have possessed a single explosive device, a single firearm, or a distributable quantity of any controlled substance. He appeared when he was required to appear. He pled guilty. He was continued on release on the same conditions. PSR ¶10.

Given Mr. Rukstales' role in this offense, the sentence his co-participant received for the same conduct, and three and a half years of successful release, a sentence of probation is sufficient but not greater than necessary.

The Probation Office calculates a total offense level of 15 and a criminal history category of II, producing an advisory range of 21 to 27 months. PSR ¶90. Counsel does not quarrel with the arithmetic. But the guidelines are advisory, *United States v. Booker*, 543 U.S. 220, 245

(2005), and this particular range does not account for the two facts that matter most in this case: that the person who drove this offense received probation, and that Mr. Rukstales has already spent three and a half years demonstrating that he can live in the community without committing the kind of crime that brought him here.

*A prison sentence would create a stark and unwarranted disparity with Melissa Simmons.*

Section 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." That is not an abstract inquiry in this case. There is a defendant, in this district, convicted of this exact offense, Distribution of Explosive Materials Without a License, arising out of this exact investigation. Melissa Simmons was sentenced on April 21, 2025, by Judge Adelman. She received two years' probation. PSR at 2.

Compare the conduct. Ms. Simmons was the target of the ATF investigation. She was the person the informant knew, the person who lit a device at a party, the person who volunteered that her family made and sold these devices. PSR ¶14. She negotiated all four controlled buys across months of texts and calls. PSR ¶¶16–22. Across those four transactions she personally sold seventy-one explosive devices, more than 250 grams of marijuana, and 14.4 grams of cocaine. *Id.* She sold out of her own bedroom. PSR ¶18. She told the informant about the thirty pounds of marijuana her father had on hand. PSR ¶20.

Mr. Rukstales' conviction on Count One rests on one transaction, which occurred in the yard of the house where his sister happened to be staying because she had fought with their father, and in which she, again, was the seller. PSR ¶¶21–22.

Counsel readily acknowledges that the two cases are not identical. Mr. Rukstales was found in possession of substantially more marijuana than Ms. Simmons ever sold, and he stands convicted of a distribution count that she did not face. That difference justifies a difference in sentence. It does not justify the difference between two years' probation and two years in prison. This Court can account for the marijuana with a longer term of supervision and with stricter conditions.

*The guideline range on Count One is driven by two enhancements that, as applied here, say very little about Mr. Rukstales' culpability.*

Six of the eighteen levels in the adjusted offense level on Count One come from two specific offense characteristics, and both deserve a hard look under 18 U.S.C. § 3553(a).

The first is the four-level increase under U.S.S.G. § 2K1.3(b)(3) for possessing explosive material "in connection with another felony offense." PSR ¶32. That enhancement exists for the defendant who puts explosives to work in service of another crime: the defendant who

uses them to threaten a rival, to destroy evidence, or to protect a stash house. Nothing like that happened here. The "connection" identified in the report is that the devices and the marijuana were recovered from the same residence on the same day. *Id.* There is no allegation that any explosive device was used to further the marijuana offense in any functional way, and no allegation that a device was offered as protection, as a threat, or as a tool of the drug trade. On these facts, four levels, the equivalent of roughly a year in prison, rest on nothing more than co-location. *See Kimbrough v. United States*, 552 U.S. 85, 109–10 (2007); *Pepper v. United States*, 562 U.S. 476, 501 (2011).

The second is the two-level increase under U.S.S.G. § 2K1.3(b)(1)(B) for an offense involving at least 100 but less than 250 pounds of explosive material. PSR ¶31. The 116-pound figure that triggers it is not a weight of finished devices at all. It is 86 pounds of potassium nitrate plus 30 pounds of potassium perchlorate: bulk precursor chemicals, the larger of which is an oxidizer sold commercially in this country for agricultural and other entirely lawful uses. *Id.* Without the precursors, the weight would not have approached the 100-pound threshold. The Court is entitled to consider that this enhancement is measuring the contents of a shed rather than the seriousness of the January 20, 2023 distribution for which Mr. Rukstales stands convicted.

Counsel raises these points not as guideline objections, but as reasons why the resulting range deserves less weight than it might in another case. *See Pepper*, 562 U.S. at 501.

*The § 3553(a) factors do not require a sentence of imprisonment.*

Mr. Rukstales is thirty-nine. He has no children and no dependents, but he is not without loved ones: a girlfriend in early recovery who relies on him, a mother, a brother he sees weekly, and a household he pays for. He has worked without meaningful interruption since he was a teenager, in physically demanding trades, and he was working when this case began and is working now. He nets four thousand dollars a month and takes nothing from the government. PSR ¶¶83–86.

He has no history of violence. None. His criminal history consists of a marijuana citation when he was nineteen, two alcohol-related driving offenses ten years apart, and a pill in his wallet during an Illinois traffic stop. PSR ¶¶51–54. Three criminal history points, all of them from low-level offenses. He has never had a term of supervision revoked.

As to specific deterrence, the Court has three and a half years of evidence, not a prediction. Mr. Rukstales was arrested, had his house searched, watched his sister prosecuted, watched his brother charged, and lost the truck-driving career he was a week away from starting. Since that day he has not touched an explosive device or a firearm. He stopped using drugs. He kept working.

As to protection of the public, the risk this case presented, a shed full of homemade fireworks and their precursors, was eliminated by the search warrant in March 2023 and cannot recur under a supervision condition barring the possession of explosive materials, precursor chemicals, firearms, and ammunition, backed by the search condition the Probation Office already recommends.

And as to rehabilitation, § 3553(a)(2)(D) directs this Court to consider the need to provide Mr. Rukstales with any needed "correctional treatment in the most effective manner." Congress has answered the threshold question of whether prison is that manner. A sentencing court must determine whether to imprison a defendant, and for how long, "recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). The Supreme Court has held that this provision "does not permit a sentencing court to impose or lengthen a prison term in order to foster a defendant's rehabilitation." *Tapia v. United States*, 564 U.S. 319, 332 (2011); *see id.* at 327–35.

What Mr. Rukstales needs is an assessment for alcohol and other drug abuse and whatever treatment follows from it, counseling for two deaths he has never processed, and the continued stability of the job and household he already has. Each of those is something this Court can order and monitor as a condition of probation. Under § 3582(a) and *Tapia*, none of them is a reason to send him to prison.

*Probation is a real punishment, and this Court has the authority to impose it.*

The Probation Office correctly notes that Mr. Rukstales is statutorily eligible for a term of probation of not less than one nor more than five years on both counts. PSR ¶94; 18 U.S.C. § 3561(c)(1). It separately notes that the guidelines do not authorize a sentence of probation here, because the minimum of the advisory range is ten months or more, which places this case in Zone D of the Sentencing Table. PSR ¶95; U.S.S.G. § 5B1.1 cmt. n.2; *id.* § 5C1.1(f) (for a Zone D range, "the minimum term shall be satisfied by a sentence of imprisonment"). Those provisions are advisory, exactly like the range they depend on. *Booker*, 543 U.S. at 245. This Court may impose a probationary sentence as a variance, and the Supreme Court has instructed sentencing courts not to treat such a sentence as a token:

> "We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007).

Those restrictions are not abstract in Mr. Rukstales' case. He would report to a probation officer on the officer's schedule, submit to testing, open his home to visits, obtain permission before leaving the district or changing where he lives or works, and be subject to search. For a man whose livelihood depends on showing up at job sites and moving other people's

furniture on short notice, those obligations are not a formality. They are a standing constraint on how he spends his days, and he will feel them every week for as long as this Court imposes them.

It is also a fraction of the cost. The Administrative Office's most recent figures, reproduced in the presentence report, put imprisonment at $4,575 per month and supervision at $519 per month. PSR ¶98. Every month Mr. Rukstales spends in the Bureau of Prisons therefore costs the public roughly nine times what a month of supervision costs. It also costs the public the income taxes he pays on the $4,000 a month he earns, which he would not be earning while incarcerated.

Mr. Rukstales respectfully requests a sentence of probation, for whatever term this Court finds appropriate, with the following conditions:

(1) an alcohol and other drug abuse assessment, with participation in any treatment recommended, and testing as directed by the probation office;

(2) a mental health assessment, with participation in any treatment recommended, including grief counseling;

(3) a prohibition on possessing explosive materials, precursor chemicals, pyrotechnic components, firearms, ammunition, and dangerous weapons;

(4) the search condition recommended by the Probation Office;

(5) full-time lawful employment; and

(6) a term of community service, in an amount the Court finds appropriate, to mark the seriousness of the offense.

Mr. Rukstales will pay the $200 mandatory special assessment. As to a fine, the Probation Office concludes that he lacks the ability to pay within the guideline range, PSR ¶98, and counsel asks the Court to consider community service in lieu of a fine pursuant to U.S.S.G. § 5E1.2(e), or a nominal fine payable on a schedule the probation office sets.

**Conclusion**

The parsimony principle governs every federal sentencing: the sentence must be sufficient, but no greater than necessary, to satisfy the purposes of punishment. Three and a half years of pretrial release have already answered most of the questions this Court would otherwise have to guess at. Mr. Rukstales has been deterred. The public does not need protection from him. There is no victim seeking retribution. What is left is a thirty-nine-year-old tradesman who sold fireworks his family had been making for years, who kept a large amount of marijuana in his house, who has said plainly that he did both and is sorry for what it has done to the

people around him, and who wants to get back to the life he was a week away from starting when this case began.

The person who ran this offense received two years' probation. Mr. Rukstales asks this Court for a sentence that reflects the same judgment: a term of probation, on conditions strict enough to hold him to it. Such a sentence is sufficient, but not greater than necessary, to meet the goals of § 3553(a).

Thank you for your time and for your consideration of this case.

Sincerely,

*s/ Patrick K. Cafferty*
Patrick K. Cafferty
Counsel for James Rukstales

SBN: 1022402